CONSOLIDATED INDEMNITY AND INSURANCE COMPANY, Plaintiff, *v.* METROPOLITAN CASUALTY INSURANCE COMPANY OF NEW YORK, Defendant.

Supreme Court, New York County, February 19, 1935.

*Lester Weil* [*John E. Leddy* of counsel], for the plaintiff.

*Rumsey & Barker* [*Robert Sykes* of counsel], for the defendant.

SCHMUCK, J. This litigation presents, so far as this jurisdiction is concerned, a novel and interesting question. Meticulous search, as is conceded by all involved, fails to discover any direct authority upon which reliance can be placed as a precedent. It is an action involving a claim · by an insurance corporation now in liquidation against defendant insurance corporation for a claim under a reinsurance agreement which the latter executed with the plaintiff. The original insurance liability assumed by the plaintiff was on a depository bond in the amount of $150,000 in favor of the county treasurer of the county of Oakland, Mich., to indemnify him against

losses arising from deposits with the People's State Trust and Savings Bank of Pontiac, Mich. The extent to which the defendant under its reinsurance agreement undertook to indemnify plaintiff was one-sixth of the entire amount, that is to say, $25,000. Other reinsurers assumed the balance of the amount so that plaintiff stood to lose nothing in case the bank failed to pay. On the other hand, it carried a risk for $100,000 of school funds deposited in the same bank no part of which it had reinsured; in consequence of which in case of the bank's failure it was confronted with the unescapable loss of $100,000. ·The bond was dated January 18, 1930, and was good for one year with the following stipulation for an extension. It reads as follows: " This bond may, if the parties hereto so elect, be continued in force from time to time for the additional period or periods by a continuation certificate executed by the principal and surety."

In October, 1930, the plaintiff approached the defendant on the subject of extending the reinsurance agreement for a further year beyond the termination of its liability. To this proposal the defendant gave a conditional assent. To exactly state its approval to the proposition it refused to do so except " on receipt of full information, including latest available examination report and up-to-date detailed statement on complete long form application." This information never materialized. Shortly after this defendant addressed a letter to the plaintiff in which it agreed to extend the reinsurance for one year beyond its termination " providing all of the direct writing companies and all of their re-insurers consent to the program outlined in your night letter of October 2, 1930." As the facts are presented, these conditions were not complied with and no further communication seems to have been had between the parties prior to January 18, 1931, the expiration date of plaintiff's depository bond. Paragraph 12 of the reinsurance contract provided for the following mode of extension for another year: " If the liability of the reinsured by the terms of the bond, be continuable by the issuance of a continuation certificate and if the liability be so continued, and if the reinsurer shall not 30 days previously have notified the reinsured, in writing, at the latter's home office, of the desire not to continue the reinsurance, this agreement shall apply to such continuation of liability for one year."

No continuation certificate was issued under the original bond, but even if it had been, it would not of itself constitute an automatic renewal of the reinsurance liability of the defendant to the plaintiff, in the face of defendant's announced intention not to renew unless certain conditions were complied with by plaintiff, which concededly never were met with compliance.

On the expiration of the original bond, that is to say, on January 18, 1931, the plaintiff issued a new bond for a further period of one year. Several days thereafter a new reinsurance agreement was forwarded to the defendant by the plaintiff. It was never executed by the defendant despite repeated requests of the plaintiff. On March 18, 1931, the bank failed and on April 16, 1931, the plaintiff made a demand upon the defendant for contribution. On June 3, 1931, defendant forwarded a statement to plaintiff containing a number of items of liability under the reinsurance agreement. On September 2, 1931, it finally offered to return the sum of $125, on the ground that there was no liability attached to it by reason of the bond issued by the plaintiff on January 18, 1931.

On this state of facts, ignoring for the nonce the effect of the premium check of $125 forwarded by plaintiff, it is meet to consider on what contractual basis the plaintiff seeks to hold the defendant liable. Obviously, the loss occurred subsequent to the expiration of the original one-year period covered by the reinsurance agreement. The provisions of paragraph 12 did not come into play because no continuation certificate was issued in connection with the original bond. The liability of defendant must, therefore, be predicated either upon some provision in the original bond or reinsurance agreement which survived the expiration of the original agreement, or else upon some waiver or estoppel on the part of the defendant. The defendant's failure to reply to plaintiff's letters inclosing new reinsurance agreement does not constitute an estoppel, because these letters were sent after the plaintiff had already executed a bond covering a second year. If the renewal of the reinsurance agreement had been sent before the expiration of the first year and defendant had failed to reply, perhaps a different situation would have been presented. However, it is needless to comment upon the possibilities in such an event.

Plaintiff seems, at all times, to have realized the difficulty of presenting a clear-cut theory upon which the defendant could be held responsible. Its theory is thus set forth in the application for leave to amend the complaint prior to trial, and which was granted: "That said renewal bond was executed by plaintiff solely as a loss prevention measure, and not as an original underwriting risk is unarguably established in that the financial condition of the bank was such that if said bond was not renewed upon the expiring date, said bank could not have paid its deposits covered by the surety bonds and, upon information and belief, defendant was obligated by Exhibit A to participate in said bond without express consent to the extent of one-sixth of any loss sustained hereunder." By this amendment the position of the plaintiff is made clear and in its

memorandum its adherence to and reliance upon the original reinsurance agreement is emphatically declared. Plaintiff argues that at or about the expiration of the original bond, the bank was not in a liquid position, and that if a renewal bond had not been issued, the county treasurer or other duly authorized officer probably would have attempted to withdraw the fund on deposit causing inevitable disaster to the underwriters because the bank could not have successfully met a demand or draft of that character. A critical situation of this sort naturally would and did lead to a conference between those vitally involved. This consultation both by correspondence and telephone resulted, so far as this defendant is concerned, in the aforementioned conditional offer to extend, and which we know was practically refused because the condition was never met. Now comes the plaintiff and asserts its right under the original contract to adopt the course which it did irrespective of the consent of the reinsurers, and regardless of consulting with them. That this is a legitimate remedy open to it is predicated on paragraph 5 of the original reinsurance agreement, which reads as follows: " The Reinsured shall take charge of all matters arising under the bond. It shall decide whether or not it is liable thereunder, and shall determine the amount of its liability in case it decides that it is liable. It shall settle or compromise any claims, and defend, settle or compromise any suits, and take such other action, not involving the extension of credit or the advancing of money, in connection with any claim matter arising under the bond as it may deem advisable. Any such decision, determination, settlement, advance, compromise or other action of the Reinsured in connection with any claim matter arising under the bond, shall be final and conclusive and unconditionally binding upon the Reinsurer; provided, that no payment or other method of settlement by the Reinsured shall preclude the Reinsurer from showing that the alleged liability or any part thereof, for loss under the bond, exists or existed under any other bond or bonds given at any time by the Reinsured."

The plaintiff relies especially upon the statement that the " Reinsured shall take charge of all matters arising under the bond," and it also relies upon the provision that the reinsured may " take such other action not involving the extension of credit, in connection with any claim matter arising under the bond as it may deem advisable." Such decision, etc., " or other action of the Reinsured in connection with any claim matter arising under the bond is to be final and conclusive and unconditionally binding upon the Reinsurer."

The first sentence, namely, that " the Reinsured shall take charge of all matters arising under the bond," is to be read in light of the enumeration of matters which it shall take charge of. These deal particularly with items that arise under claims against the bond. The settlement, compromise or adjustment of claims is subsequently granted to the reinsured without interference or question by the reinsurer, and the decision of the reinsured is final and conclusive upon the reinsurer. Now, plaintiff says that this authority to make a final and conclusive decision is not limited to compromise of claims, but is much broader, in that the reinsured is authorized to " take such other action, not involving the extension of credit or advancing of money, in connection with any claim matter arising under the bond as it may deem advisable." There are two limitations in the language quoted of any claim of sweeping power of the reinsured to bind the reinsurer. One is the principle of construction known as *ejusdem generis*, which limits the action referred to, to the enumerated items preceding it; in other words, " such other action " under the rule of *ejusdem generis* refers to settlement, compromise, defense or other acts of like character. The other limitation is involved in the language of the clause itself which limits such other action to claim matters arising under the bond. A claim matter, reading the language as a whole, would seem to refer to claims by the obligee for loss or damage under the obligation. The clauses or phrases prohibiting any action involving the extension of credit or the advancing of money would appear to emphasize the fact that situations arising after loss and claims thereunder are contemplated. The term " extension of credit " is used in the general and ordinary commercial sense of granting credit not in the unusual sense of lengthening the period of credit. A situation is contemplated by these two exceptions whereby the reinsured may not bind the reinsurers without their consent by making temporary interim or conditional or stop-gap adjustments by either extending its credit or paying money to the principal on the bond or, perchance, even to the obligee. The contemplation is that only a final adjustment is intended to be under the controlled discretion of the reinsured and not a temporary adjustment which will defer the obligee's claim or tide over the principal so as to avoid a claim on the part of the obligee. It is conceded that the loss did not occur during the period of the original reinsurance contract but two months thereafter. Plaintiff's contention that it was authorized unconditionally by the terms of paragraph 5 to take steps to tide over the situation by binding its reinsurers to an extension of the agreement without their express consent is not borne out by the reasonable interpretation of the language of paragraph 5, and that there was no unlimited

authority in the plaintiff to act in all matters is further borne out by the language of paragraph 7, which provides that " in case any change or alteration in the bond or in any instrument, contract or agreement concerned with the bond, shall be proposed, that the Reinsurer shall not make such change or permit such alteration without securing from the Reinsurer's home ˙office the consent thereto of the Reinsured in writing. If such consent be given, and the change or alteration be made, the Reinsured shall give notice thereof in writing to the Reinsurer, at the Reinsured's home office." No such consent to the extension was given, and no notice of the necessity of adopting a course of action to prevent loss was given. It is conceivable that circumstances might arise, such as the necessity of preventing immediate loss to perishable goods, which might authorize emergency action on the part of the reinsured. But this was far from the situation in the *lis sub judice*. Why should the judgment of the plaintiff in the present situation be considered unqualified and unbounded? Parties might well differ as to the necessity of keeping the bank open. Peradventure, liquidation by refusal to renew might in the last analysis be ultimately the best for all parties in minimizing final loss on liquidation. It was not intended that the reinsured should be the ultimate judge in such a matter and bind the reinsurers against their consent. It is true that a majority of the reinsurers might favor the plan of the reinsured to extend the bond so as to defer a loss and possibly tide over the difficult situation. To say that a small minority might prevent the majority from acting is just as effective an argument as in a common-law composition to say that the refusal of a few creditors could defeat the composition. If the majority, prompted by motives of prudence, acquiesced in the extension of the reinsurance, as they did here, they acted in what they conceived was their best interest. The minority electing to pursue a contrary course, as did this defendant, had the right to do so. The action of the defendant apparently did not influence the majority to withdraw from the adopted course of conduct. There is nothing in paragraph 5 which gave the plaintiff unlimited authority to extend the agreement to prevent a possible claim loss. Its extension of the agreement for one year without express consent of the reinsurers was virtually a modification of the original agreement, and, as such, it required the consent of the reinsurers within the terms of the provisions of paragraph 7. Under these circumstances plaintiff has failed to prove a.right to bind the defendant to another year's reinsurance liability on the doctrine of prevention of loss and on that theory the complaint should be dismissed.

This leaves for consideration the second point of waiver or estoppel urged by the plaintiff, namely, that the retention of the premium

of $125 tendered in June, 1931, and retained by the defendant for an appreciable period, constitutes an unconditional acceptance of liability. Plaintiff's argument might have had some weight if the defendant had retained the premium before the actual loss had occurred. In any event, *Northwestern Fire & Marine Ins. Co. v. Connecticut Fire Insurance Co.* (105 Minn. 483, 490; 117 N. W. 825, 827) is an authority squarely contrary to plaintiff's contention. In that case the plaintiff did not mail the premium until after the property was destroyed by fire. Defendant retained the premium as part of an original check in settlement of current accounts. The court held that the retention of the premium by the insurance company did not estop the defendant from asserting that it was not in force. The most that could be said was that the retention of the premium was evidence of an intention not to claim that the policy is invalid. In the face of the refusal of the defendant to recognize the contract as sufficient, it was not in itself enough " to create an obligation, or to have a retroactive effect by creating a contract making the defendant responsible for the loss." Because of the foregoing, the plaintiff's motion for a directed verdict is denied and defendant's motion for dismissal and directed verdict is granted.